# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

––––––––––––––––––––

Nº 06-CV-1747 (JFB)

––––––––––––––––––––

OSCAR AYALA,

Petitioner,

VERSUS

ROBERT ERCOLE, SUPERINTENDENT,
GREEN HAVEN CORRECTIONAL FACILITY,

Respondent.

––––––––––––––––––

MEMORANDUM AND ORDER
April 17, 2007

––––––––––––––––––

JOSEPH F. BIANCO, District Judge:

Oscar Ayala ("petitioner") petitions this Court *pro se* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction in state court. Petitioner was convicted in a judgment rendered on January 22, 2001, following a jury trial, in the Supreme Court, Nassau County, of murder in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree. He was sentenced to an indeterminate term of imprisonment of twenty-five years to life.

Petitioner challenges his conviction on the following grounds: (1) the prosecution did not provide legally sufficient evidence to prove petitioner's guilt beyond a reasonable doubt, thus denying him due process of law; (2) petitioner was prevented from cross-examining the prosecution's key witnesses, thus depriving him of his constitutional right to confront the witnesses against him and denying him due process of law; (3) the trial court improperly permitted the prosecution to inquire into petitioner's prior criminal record, thus denying him due process of law; and (4) the prosecution engaged in improper conduct and made inappropriate comments during the course of the trial.

For the reasons set forth below, the petition is denied.

## I. Background

The following facts are derived from the instant petition and the underlying record.

### A. Pre-Trial Proceedings

Petitioner was charged with two counts of murder in the second degree (N.Y. Penal Law §125.25[1]), criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03), and criminal possession of a weapon in the third degree (N.Y. Penal Law § 265.02[4].)[1]

At a pre-trial *Sandoval* hearing,[2] the court addressed whether to allow questioning, if the petitioner took the stand, related to two of petitioner's four prior convictions. In particular, petitioner had four prior criminal convictions, including a conviction for harassment, a conviction for attempted criminal contempt, and two convictions as a youthful offender. The prosecution requested permission to cross-examine petitioner regarding two of these prior crimes: (1) the underlying facts, but not the disposition, of one of the youthful offender convictions for attempted grand larceny (which involved an attempt to steal a car); and (2) the conviction for attempted criminal contempt (arising from

_____

[1]The prosecution proffered the second murder charge of depraved indifference as an alternate theory of the crime. The trial judge instructed the jury not to consider the second count of depraved indifference murder if the jury found petitioner guilty of the first count of murder in the second degree. (Tr. 666-67.)

[2]A *Sandoval* hearing is an evidentiary hearing that is held by the trial court to determine, should the defendant testify, whether a prior conviction may be used to impeach his credibility. *See People v. Sandoval*, 314 N.E.2d 412, 416 (N.Y. 1979).

his violation of an order of protection), without going into the facts of the case. The trial judge granted the prosecutor's request as to the attempted criminal contempt conviction, but denied the request as to the youthful offender crime. (Tr. 6-11.) Petitioner's counsel objected to the court's ruling on the attempted criminal contempt conviction. (Tr. 11.)

### B. The Trial

#### (1)The Prosecution Case

Juan Portillo ("Portillo") was a member of the gang Salvadorians With Pride (hereinafter "SWP"). Petitioner was a member of a rival gang, Mara Salvatrucha (hereinafter "MS-13"). Since 1998, SWP and MS-13 have been engaged in a gang war. (Tr. 454.) On the night of October 15, 1999, Portillo was sitting on the front steps of his home in Hempstead, New York. Accompanying him were five friends, Jonas Gutierrez, William Duran, Emerson Castaneda, Francisco Alexander Castro, and Jorge Rivas Ramos ("Gutierrez," "Duran," "Castaneda," "Castro," and "Ramos," respectively). (Tr. 298-99, 346, 358, 381, 390-91, 466, and 497.) During that evening, they observed a car slowly driving by the house several times. (Tr. 301-02, 326-28, 394-95, 467-69, and 501.) The last time the car drove past, it stopped about a block away. (Tr. 471-72.)

Petitioner got out of the car and approached the house on foot. Upon reaching the front of the house, petitioner pulled out a gun and fired five or six shots. (Tr. 352-57, 384, 400-01, 403, 419-20, 473-76, 505-11, 519.) Two bullets struck Portillo, one piercing his intestine in several places. The contents of his intestine spilled into his abdomen, causing a massive infection. (Tr. 535-39.) Portillo's wounds were not immediately fatal; rather,

despite multiple surgeries, he died two months later on December 21, 1999, from complications from the gunshot wounds due to infection. (Tr. 540.)

After Portillo's death, the five witnesses came forward identifying petitioner as the shooter. All five had known petitioner prior to the shooting, and all had seen petitioner shoot Portillo.[3]

### (2) The Petitioner's Case

Petitioner testified that he was nineteen years-old at the time of the trial and had joined MS-13 in El Salvador and was still a

---

[3] At trial, the five witnesses were able to make identifications of petitioner. Gutierrez testified that he attempted to help Portillo and saw the shooter for two seconds, and, in court, identified petitioner (using his nickname "San Coco") as the shooter. (Tr. 310-11.) Duran testified that he recognized petitioner riding in the car that passed by the house, and that he saw petitioner approaching the house. (Tr. 348.) In court, he identified petitioner as the man who pulled out a gun and started shooting. (Tr. 348.) Castaneda also identified petitioner as an occupant of the car, and testified that he saw petitioner firing the weapon. (Tr. 393, 400.) At trial, Castro identified petitioner as an occupant of the car and as the shooter. (Tr. 469, 476.) Finally, Riva identified petitioner as the man he saw approach the house and start shooting at Portillo. (Tr. 508-510.) On cross-examination, three witnesses for the prosecution, Duran, Castro, and Ramos, exercised their Fifth Amendment privilege against self-incrimination for certain unrelated crimes.

member. (Tr. 551-52, 569.) Petitioner further testified that he was not an occupant of the car that drove by the house on October 15, 1999, and was not the shooter. (Tr. 553.) Instead, he claimed that he was at home with his girlfriend and his landlord that night. (Tr. 554-55.)

### (3) The Verdict and Sentence

On February 21, 2001, petitioner was convicted of murder in the second degree (N.Y. Penal Law § 125.25[1]), criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03) and criminal possession of a weapon in the third degree (N.Y. Penal Law §§ 265.02[4]). The trial judge sentenced petitioner to a prison term of twenty-five years to life.

### C. State Appeals/Post-Judgment Motions

Petitioner appealed his conviction to the New York Supreme Court, Appellate Division, Second Department (hereinafter, the "Appellate Division") arguing, *inter alia*, that the prosecution had failed to prove his identity as the shooter by legally sufficient evidence, that he was denied his right to confront the witnesses against him, that the trial court's ruling under *Sandoval* constituted an inappropriate exercise of discretion, and that the prosecutor made inappropriate comments during the trial. The Appellate Division unanimously affirmed the judgment of the trial court on February 14, 2005. (*People v. Ayala*, 15 A.D.3d 496, 2005 N.Y. Slip. Op. 01209 (N.Y. App. Div. 2005)). On May 6, 2005, an Associate Judge of the New York Court of Appeals denied leave to appeal from the Appellate Division's order. (*People v. Ayala*, 831 N.E.2d 973 (N.Y. 2005)).

### D. The Instant Petition

On April 3, 2006, petitioner filed a *pro se* petition with this Court for a writ of habeas corpus, raising the four claims he had submitted on direct appeal. This Court issued an Order to Show Cause on April 17, 2006. An opposition was filed on May 17, 2006.

## II. STANDARD OF REVIEW

To determine whether a petitioner is entitled to a grant of a writ of habeas corpus, a federal court must apply the standards of review provided in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254. "Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Earley v. Murray*, 451 F.3d 71, 74 (2d Cir. 2006). A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Williams*, 529 U.S. at 413; *see also Earley*, 451 F.3d at 74.

AEDPA establishes a deferential standard of review – "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit has noted that although "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)); *accord Earley*, 451 F.3d at 74.

When reviewing a habeas petition, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241; *see also Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam); *Cook v. N.Y. State Div. of Parole*, 321 F.3d 274, 277 (2d Cir. 2003). Federal habeas corpus relief does not lie for errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)); *see also Pulley v. Harris*, 465 U.S. 37, 41 (1984); *DiGuglielmo v. Smith*, 366 F.3d 130, 136-37 (2d Cir. 2004); *Lydon v. Kuhlman*, 62 F. Supp. 2d 974, 977-78 (E.D.N.Y. 1999).

### III. THE EXHAUSTION REQUIREMENT

A district court shall not review an application for a writ of habeas corpus unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254[b][1]. The procedural bar rule in the review of applications for writs of habeas corpus is based on the comity and respect with which state judgments must be accorded. *House v. Bell*, ___U.S. ___, 126 S.Ct. 2064, 2076 (2006). Respondent argues that petitioner has failed to exhaust state remedies, and thus, petitioner's legal insufficiency claim and prosecutorial misconduct claim are procedurally barred from *habeas* review. The legal insufficiency claim was raised on direct appeal, and the Appellate Division explicitly dismissed it as unpreserved under New York law. *Ayala*, 789 N.Y.S.2d at 439. The prosecutorial misconduct claim was raised on appeal and dismissed, although the grounds for dismissal are unclear.[4] *Id.*

Petitioner's federal claims may be procedurally barred from habeas corpus review if they were decided at the state level on adequate and independent procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729-33 (1991). The purpose of this rule is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. *Id.*, at 730-31.

### A. Legally Insufficient Evidence Claim

The procedural bar applies when a state court's decision contains a "plain statement" that it is relying on an appropriate state law to deny a claim. *Michigan v. Long*, 463 U.S. 1032, 1042 (1983). The Supreme Court has consistently applied the *Long* rule since it was established. *See Harris v. Reed*, 489 U.S. 255, 261 (1989); *see also Ohio v. Robinette,* 516 U.S. 33, (1996); *Pennsylvania v. Labron*, 518 U.S. 938 (1996); *Arizona v. Evans*, 514 U.S. 1 (1995); *Coleman*, 501 U.S. at 723; *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986).

The rule applies to both substantive and procedural state laws. *See Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985) (applying the *Long* "plain statement" rule to a procedural state law). "[T]he state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." *Id.*

As to petitioner's claim that the evidence was legally insufficient to show guilt beyond a reasonable doubt, the Appellate Division stated that it was "unpreserved for appellate review."

---

[4] The Appellate Division did not specify its reasons for dismissing certain of petitioner's claims, including the prosecutorial misconduct claim. It stated only that "the defendant's remaining contentions are unpreserved for appellate review (see CPL§ 470.05[2]), without merit, or do not require reversal." *Ayala* 789 N.Y.S.2d at 439.

789 N.Y.S.2d at 439. To support this conclusion, the Appellate Division cited N.Y. Crim. Proc. Law § 470.05, which states, in relevant part, that:

> [f]or the purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered.

In New York, an objection to the legal sufficiency of the evidence takes the form of a motion to dismiss. *People v. Thomas*, 330 N.E.2d 609, 610 (N.Y. 1975.) The motion must be made in order for an insufficient evidence claim to be preserved for review, *People v. Bynum*, 518 N.E.2d 4 (N.Y. 1987), and the motion must be made "at the close of the People's case." *Thomas*, 330 N.E.2d N.Y.2d at 610.

At trial, petitioner's counsel made a motion to dismiss the second count of the indictment, depraved indifference murder, on the grounds that the prosecution had not produced sufficient evidence of indifference, and the trial court denied the application. (Tr. 546-47.) Petitioner's counsel did not, however, move to dismiss the three charges for which petitioner was convicted. As no motion was made, the issue of legal sufficiency of the evidence was unpreserved for appellate review under New York law, and petitioner's claim is procedurally barred from federal habeas review. In any event, irrespective of the procedural bar, petitioner's claim is without merit as discussed *infra*.

### B. The Prosecutorial Misconduct Claim

"The question whether a state court's reference to state law constitutes an adequate and independent state ground for its judgment may be rendered difficult by ambiguity in the state court's opinion." *Harris*, 489 U.S. at 261. Such is the case for petitioner's habeas claim for prosecutorial misconduct. The Appellate Division did not expressly state whether it dismissed that claim on substantive or procedural grounds. However, petitioner did not raise this claim in his application for leave to appeal to the New York Court of Appeals, but rather specifically sought review of two other claims he asserted in the Appellate Division – namely, the Confrontation Clause and *Sandoval* claims.

Therefore, as set forth below, the claim is procedurally barred regardless of which grounds the Appellate Division relied upon.

If the prosecutorial misconduct claim was decided by the Appellate Division on the ground that it was unpreserved for appellate review, it is not subject to review in a habeas proceeding because it was decided on an adequate and independent state procedural ground.[5] *See Coleman,* 501 U.S. at 729-32.

Similarly, if the Appellate Division decided the claim on the merits, petitioner is barred from raising the issue of prosecutorial misconduct in his application for a writ of habeas corpus because he failed to raise it in his application for leave to appeal to the New York Court of Appeals. As described *supra*, an applicant must exhaust all possible state remedies before petitioning the district court. *See* 28 U.S.C. § 2254[b][1]. The Supreme Court has noted that "'it would be unseemly in

---

[5] Under such circumstances, petitioner would not have been required to assert that claim in his application to the New York Court of Appeals to exhaust it because that Court is without the authority to entertain unpreserved claims. *See* N.Y. Crim. Proc. Law §§ 470.05(2), 470.35(1).

our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation.'" *Rhines v. Weber*, 544 U.S. 269, 274 (2005) (quoting *Darr v. Burford*, 339 U.S. 200, 204 (1950)). As the Court of Appeals has not had the opportunity to correct the violation petitioner asserts and it is too late to raise it now, the claim is deemed exhausted but procedurally barred. *See Coleman v. Thompson,* 501 U.S. at 732.

Accordingly, whether the Appellate Division dismissed the prosecutorial misconduct claim as unpreserved for appellate review or on the merits, it is procedurally barred. However, as discussed *infra,* even assuming *arguendo* that the claim was not procedurally barred, petitioner's claim fails on the merits.

## IV. LEGAL INSUFFICIENCY CLAIM

Petitioner claims that the evidence presented at trial was legally insufficient to prove his guilt beyond a reasonable doubt, thus violating his Fourteenth Amendment right to due process of law.

A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in an application for a writ of habeas corpus. *Eingaugler v. Supreme Court of the State of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997). A criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1976); *see also Policano v. Herbert*, 430 F.3d 82, 86 (2d Cir. 2005) (stating that "[i]n a challenge to a state

criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found upon the record evidence adduced at the trial no rational trial of fact could have found proof of guilt beyond a reasonable doubt"); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). A criminal conviction will stand so long as "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984) (internal quotation omitted)). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994).

Petitioner argues that there was insufficient evidence identifying him as the shooter. At trial, the evidence establishing the identity of the shooter was the testimony of the five eyewitnesses – Gutierrez, Duran, Castaneda, Castro, and Riva. According to their trial testimony, all five witnesses were present during the shooting, and all five had known petitioner prior to the shooting. As set forth below, the Court finds petitioner's claim to be without merit.

### A. The Eyewitness Testimony

At trial, Gutierrez testified that he had attempted to help Portillo and saw the shooter for two seconds. He then identified petitioner

as the man who he saw shooting. (Tr. 310-11.) Gutierrez testified that he had known petitioner prior to the shooting from Hempstead High School, which they both had attended. (Tr. 316-17.) He stated that he had been drinking for several hours before the shooting, and had consumed the equivalent of approximately ten to twelve beers at the time the incident occurred. (Tr. 324-325.) He further testified that there were bushes between him and the shooter. (Tr. 307.) On the night of the shooting, Gutierrez was interviewed by the police, yet he did not identify petitioner as the shooter at that time. (Tr. 332.) He testified that fear kept him from making the identification, as he had never been in a gang before and did not want to get involved with one. (Tr. 338.)

Duran testified that he witnessed a white car drive by the house several times prior to the shooting, and that he recognized petitioner riding in the passenger seat. (Tr. 348.) Duran stated that he was able to see petitioner's face as petitioner approached the house.[6] (Tr. 355-56.) Duran watched as petitioner pulled out a gun, shouted "Mara Salvatrucha," and began firing. (Tr. 356.) Duran was able to recognize petitioner because they both lived in the same building. (Tr. 349.) Duran testified that he had been drinking that night with the other witnesses (Tr. 346), and that he did not have a good memory. (Tr. 375.) Duran was interviewed on the night of the incident, but explained that he did not identify petitioner as the shooter because he had never been in a gang and was afraid. (Tr. 377.)

Castaneda also was able to identify petitioner as an occupant of the car he witnessed driving past the house before the shooting. (Tr. 393.) He testified that he was walking to the front of the house when the shooting started, and he identified petitioner as the shooter. (Tr. 400.) Castaneda had known petitioner in El Salvador when they were children, and had become reacquainted with him after both separately moved to the United States. (Tr. 395-96.) Castaneda testified that he did not identify petitioner as the shooter until after the death of Portillio because of family connections in El Salvador. (Tr. 422.)

Castro witnessed the car driving past and identified petitioner as one of its occupants. (Tr. 469.) Castro testified that he observed someone shooting in the front yard, and he identified petitioner as the shooter. (Tr. 476.) He had lived in the same building as petitioner and had known him for about a year prior to the shooting. (Tr. 470-71.) Castro testified that he had been smoking marijuana just prior to the shooting. (Tr. 468.) According to Castro, the reason he did not identify petitioner as the shooter when he was interviewed by the police on the night of the shooting was because he was traumatized and scared. (Tr. 490.)

Riva was a member of the gang SWP. (Tr. 495-96.) He observed petitioner in the car driving in front of the house, and saw that the occupants of the car were making hand gestures indicating that they belonged to MS-13. (Tr. 501-02.) He testified that he saw petitioner approach the house, then pull out a gun and shoot at Portillo. (Tr. 508-10.) Riva testified that he could only see half of the shooter's face, but was able to identify petitioner because of the tattoo on his face. (Tr. 510.) Riva had lived in the same building as petitioner for two years, and knew that petitioner was a member of a rival gang. (Tr. 502-04.) He also testified that he had been drinking and smoking marijuana prior to the

---

[6]Duran identified petitioner by his nickname "San Coco." (Tr. 355-56.)

shooting. (Tr. 497-98.) Riva explained that he did not immediately identify petitioner as the shooter to the police because he didn't know whether Portillo "wanted to take revenge on it or if he wanted to go to the police after he got out of the hospital." (Tr. 527.)

## B. Credibility

Petitioner's claim rests, in its entirety, on the suggestion that the testimony of the five eyewitnesses was not credible, and should not have been given enough weight to result in conviction.

The credibility and reliability of witness testimony is a question of fact to be determined by the jury. *Mason v. Brathwaite*, 432 U.S. 98, 116 (1977). While the testimony of these witnesses may contain questionable elements, "[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Mason*, 432 U.S. at 116. As credibility is a question of fact for a jury, the jury is "*exclusively* responsible for determining a witness' credibility." *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (emphasis added). Thus, a district court cannot second-guess a jury's credibility determination upon review of a habeas petition. *United States v. Zabare*, 871 F.2d 282, 286 (2d Cir. 1989) ("[T]he reviewing court *must* draw all reasonable inferences and resolve all issues of credibility in favor of the verdict.") (emphasis added); *see e.g. Gruttola v. Hammock*, 693 F.2d 922, 928 (2d Cir. 1981) (rejecting a claim of legally insufficient evidence on grounds that the jury had determined that the prosecution's witnesses were credible); *Hogan v. West*, 448 F. Supp. 2d 496, 513 (W.D.N.Y. 2006) ("[T]his court is not free to second-guess the jury's

credibility determinations); *Huber v. Schriver*, 140 F. Supp. 2d 265, 277 (E.D.N.Y. 2001) ("[M]ost of petitioner's argument rests on the suggestion that the eyewitness testimony was not credible and should not have been given enough weight to result in his conviction . . . . However, under both the state law . . . and the federal law, issues of credibility, as well as the weight to be given to the evidence, are questions to be determined by the jury."); *Fagon v. Bara*, 717 F. Supp. 976, 979 (E.D.N.Y. 1989) (holding that a federal habeas court "is not free to make credibility judgments about the testimony presented at petitioner's trial"); *Milton v. Riley*, No. 88-CV-2848, 1988 WL 140663 (MM), at *1 (E.D.N.Y. Dec. 12, 1988) (holding that a federal habeas court is bound to the credibility determinations made by the jury); *Soto v. Lefevre*, 651 F. Supp. 588, 592 (S.D.N.Y. 1986) (holding that a federal habeas court has no power to review the credibility of eyewitnesses).

As the testimony identifying petitioner as the shooter came from five eyewitnesses, and as the jury convicted petitioner, there is a reasonable inference that the jury found the testimony of Gutierrez, Duran, Castaneda, Castro and Riva to be credible. As the jury found the eyewitnesses credible, they are deemed credible for purposes of this habeas review.

## C. Identification

In connection with the eyewitness testimony, this Court has also considered whether there was a substantial danger of "irreparable misidentification" of petitioner. *Snow v. Reid,* 619 F. Supp. 579, 582 (S.D.N.Y. 1985). "A conviction based on eyewitness identification will be set aside if the pre-trial identification procedure used was 'so impermissibly suggestive as to give rise to a

very substantial likelihood of irreparable misidentification.'" *Id.* at 581. (quoting *Simmons,* 390 U.S. at 384). The likely reliability of eyewitness pretrial identification is determined by weighing five factors:

 [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*U.S. v. Butler*, 970 F.2d 1017, 1021 (2d Cir. 1998) (quoting *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)). While this test was established to address dubious pre-trial identifications, it also applies to identifications made at trial. *Kennaugh v. Miller*, 289 F.3d 36, 47 (2d Cir. 2002) ("[T]he *Biggers* analysis applies to . . . in-court identifications for the same reasons that the analysis applies to impermissibly suggestive pre-trial identifications. The due process concerns are identical in both cases and any attempt to draw a line based on the time the allegedly suggestive identification technique takes place seems arbitrary. All of the concerns that underlie the *Biggers* analysis, including the degree of suggestiveness, the chance of mistake, and the threat to due process are no less applicable when the identification takes place for the first time at trial.") (citing *United States v. Rundell*, 858 F.2d 425, 426 (8th Cir. 1988)) .

Petitioner points to certain aspects of the eyewitnesses' testimony and attempts to call into question their attention to detail. Although their views of petitioner might not have been perfect,[7] all five eyewitnesses had the opportunity to view petitioner at the time of the shooting, and each saw petitioner before, during, or immediately after the shooting. Moreover, although the fact that four of the eyewitnesses had been consuming alcohol and two had been smoking marijuana prior to the shooting may impact the level of detail that they could have observed, consumption of alcohol or drugs does not necessarily negate an eyewitness' attention to detail. *See Gilbert v. Superintendent of Collins Cor. Facility*, No. 03-CV-3866 (LBS), 2004 WL 287683, at *9 (S.D.N.Y. Feb. 11, 2004) (stating that a witness had a high degree of attention, irrespective of his alcohol and narcotics consumption). The eyewitnesses were able to discern the gang signs petitioner was flashing as the car drove past, a fact demonstrating their ability to observe detail despite their alcohol and drug consumption, the lighting conditions, or any other factor that petitioner asserts would nullify their identification.

All of the witnesses had known petitioner for a significant period of time prior to the shooting. When they came forward to identify him as the shooter, they provided the police with his name, not merely a physical description. In court, each of them pointed to petitioner, identifying him as the man they each saw shoot Portillo.

All of the witnesses demonstrated certainty that petitioner had been the shooter. They provided the police with both his name and nickname. In court, they each identified him clearly and without hesitation, and each was able to clearly describe his relationship with

---

[7] There were several questions of visibility raised at trial, including the dark lighting conditions, the landscaping in front of the house, and petitioner's hooded sweatshirt.

petitioner and knew that petitioner was a member of MS-13.

Finally, the length of time between the crime and the confrontation was not so long as to raise any uncertainty as to the witnesses' identification. The witnesses recognized petitioner at the time of the shooting, and they identified him to the police within two months. Each was able to recall other significant details about the shooting.

An identification by a witness who knew the defendant previously often carries great weight. *See Marbley v. Lockhart*, 846 F.2d 1161 (8th Cir. 1988) (holding that the identification of the defendant by the defendant's niece provided overwhelming evidence of guilt sufficient to overcome defects in defendant's representation); *Crawford v. Cain*, No. 04-CV-0784 (SSV), 2006 WL 1968872, at *22 (E.D. La. 2006) (holding that because there was testimony by two eyewitnesses who knew the defendant, it was not reasonably probable that undisclosed evidence, if admitted, would have impacted the trial in light). In the present case, all five eyewitnesses knew petitioner and recognized him during the shooting, substantially limiting the danger of irreparable misidentification. Further, the persuasiveness of multiple eyewitnesses is great, and the testimony of the five eyewitnesses together overcomes any deficiencies in their individual testimony. *See Benn v. Greiner,* 402 F.3d 100, 106 (2d Cir. 2005) (holding that prior false allegations made by a rape victim did not raise reasonable doubt in light of testimony by multiple eyewitnesses); *see also U.S. v. Copeland*, 369 F. Supp. 2d 275, 311 (E.D.N.Y. 2005) (stating that the testimony of multiple eyewitnesses would establish a "clear, independent likelihood of conviction").

Thus, the Court finds that the *Biggers* factors do not weigh against the identification made by the five witnesses during trial. Further, the fact that there were five eyewitnesses, all of whom knew petitioner prior to the crime, and all of whom testified that petitioner shot Portillo, indicates that there is no substantial likelihood of irreparable misidentification.

In sum, the evidence presented at petitioner's trial is overwhelming. Five eyewitnesses, all of whom had known petitioner for between one year to a lifetime, testified that they watched petitioner shoot Portillo. The testimony of one eyewitness alone can cause a rational trier of fact to convict a defendant. *See Bentley v. Scully*, 41 F.3d 818, 825 (2d Cir. 1994) (stating that eyewitness testimony and identification constituted a major portion of overwhelming evidence of guilt); *see also King*, 210 F. Supp. 2d at 185 (holding that a petitioner's claim of legally insufficient evidence lacked merit in light of eyewitness identification); *Huber*, 140 F. Supp. 2d at 277 (holding that the testimony of one eyewitness defeated a petitioner's claim of legally insufficient evidence). The testimony of so many witnesses who knew petitioner prior to the shooting was a sufficient basis for a rational jury to find petitioner guilty beyond a reasonable doubt. Thus, petitioner's first ground for habeas relief is without merit.

## IV. CONFRONTATION CLAIM

Petitioner claims that he was denied his right to cross-examine his accusers when three of the witnesses against him – Duran, Castro, and Ramos – invoked their Fifth Amendment privilege against self-incrimination when asked on cross-examination about their prior criminal

conduct.[8] As set forth below, the Court finds that this claim is without merit.

## A. The Witnesses

Defense counsel cross-examined Duran about prior uncharged crimes. Duran invoked the Fifth Amendment when asked if he had possessed a firearm and menaced someone with it on June 14, 2000. Counsel also asked Duran if he went by the name of William Fernandez. Duran did not answer the question until he had conferred with his attorney, and then replied in the negative.[9]

During cross-examination, petitioner's counsel inquired into Castro's criminal background. Upon conferring with counsel, Castro exercised his Fifth Amendment right against self-incrimination when asked whether he engaged in an act of criminal trespass on December 7, 1999.[10] Castro also took the Fifth

---

[8] As a threshold matter, it appears that petitioner has waived this Confrontation Clause claim. During trial, the prosecution notified petitioner's counsel and the trial court that several of his witnesses had pending criminal charges and would likely exercise their Fifth Amendment privilege against self-incrimination during petitioner's cross-examination. At the time, petitioner made no objections, nor did petitioner object after the trial judge gave instructions to the jury, even when the trial judge specifically asked petitioner's counsel if he had any objection to the charge given to the jury regarding witnesses taking the Fifth Amendment. As no objection was raised, and, in particular, as petitioner's counsel affirmatively agreed with the jury charge regarding the witnesses who took the Fifth Amendment, one could conclude that it was waived in a knowing and intelligent way and is, therefore, extinguished. *See, e.g., United States v. Yu-Leung,* 51 F.3d 1116, 1122 (2d Cir. 1995) ("If...the party consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver,' which will negate even plain error review.") (citing *U.S. v. Coonan,* 938 F.2d1553, 1561 (2d Cir. 1991)). However, in an abundance of caution, the Court will not dismiss on this waiver, but rather will address the claim on the merits.

[9]On this point, the transcript reads as follows:

> Q: Mr. Duran, do you also go by the name

of William Fernandez?
A: I cannot answer that question.
Q: Are you invoking the Fifth Amendment on that question?
A: I cannot tell you anything. I didn't talk to my lawyer.
Q: Do you wish to consult with your lawyer on that question?
A: I don't know if he wants to.
Q: Do you wish to consult with your lawyer on that question?
A: Yes.
Duran then conversed with counsel.
Q: Mr. Duran, when we broke, I was asking you if you had used the name William Fernandez.
A: Never.

(Tr. 383-84.)

[10]Castro had initially answered the question before the trial judge struck it and directed him to confer with counsel. The transcript reads thus:

> Q: Mr. Castro, on December 7th of 1999, did you engage in acts of criminal trespass?
> A: Yes.
> THE COURT: Strike that. Look at your attorney. Strike that. Disregard it.
> MR. BARBUTO: Judge, under the circumstances, could we have the attorney next to him so we don't have a communication problem?
> MS. SCHULTZ: Thank you.
> THE COURT: Disregard that answer. Okay, ask the question again.
> Q: On December 7th of 1999, did you engage in an act of criminal trespass?
> (Whereupon the witness confers with his

Amendment when asked whether he had engaged in the acts of petit larceny, criminal mischief and criminal trespass on April 10, 2000, and he invoked the right again when asked whether he had engaged in the act of the intentional destruction of property on April 12, 2000, and a fourth time when asked whether he had engaged in a criminal act of trespass on April 13, 2000. Each time he testified that answering those questions may tend to incriminate himself. Castro testified that he did not know whether the Nassau District Court had issued a bench warrant for his arrest for failure to appear in court. (Tr. 487-89.)

Defense counsel questioned Ramos as to his criminal record, and Ramos stated that he had pled guilty to the charge of criminal trespass. When asked whether he had committed robbery on September 25, 2000, Ramos attempted to take the Fifth Amendment. Ramos had pled guilty to that charge, and the question was rephrased. Defense counsel asked Ramos whether he had pled guilty to the charge of robbery in the third degree, and whether that charge was a felony. Ramos answered both questions affirmatively.

---

attorney.)
A: I cannot answer that question.
Q: Are you taking the Fifth Amendment on that question?
A: Yes.
Q: And by taking the Fifth Amendment, are you saying that the answer may tend to incriminate you?
MR. WALSH: Objection.
THE COURT: I'll allow it. You can answer it.
A: Yes.

(Tr. 487-88.)

## B. The Confrontation Clause

"The confrontation clause of the sixth amendment guarantees a criminal defendant the right to cross-examine witnesses against him." *Dunbar v. Harris*, 612 F.2d 690, 692 (2d Cir. 1979) (citing *Davis v. Alaska*, 415 U.S. 308, 315 (1974)). "The right of cross-examination, though not absolute, is one of the most firmly established principles under Supreme Court law." *Cotto v. Herbet*, 331 F.3d 217, 248 (2d Cir. 2003). A violation of the Confrontation Clause occurs when a defendant is "prohibited from engaging in otherwise appropriate cross-examination designed . . . to expose the to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (internal quotation marks omitted).

The Supreme Court has divided its Confrontation Clause jurisprudence into two broad categories: cases involving the admissibility of statements made by witnesses out of court, and cases involving limitations on a defendant's right to cross-examine witnesses. *Delaware v. Fensterer*, 474 U.S. 15, 18 (1985). The issue petitioner raises falls into the latter category. The purpose of the confrontation clause is to "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis*, 415 U.S. at 315. Restrictions on a criminal defendant's ability to cross examine the prosecution's witnesses may "effectively . . . emasculate the right of cross-examination itself." *Smith v. Illinois*, 390 U.S. 129, 131 (1968).

Here, petitioner's counsel attempted to ask Duran, Castro, and Ramos about their criminal histories in order to impeach their credibility.

Petitioner argues that, when the three witnesses asserted their Fifth Amendment rights against self-incrimination, he was denied an opportunity to cross-examine the witnesses against him in violation of his Sixth Amendment right to confront his accuser and his right to due process under the Fourteenth Amendment.

## C. The Fifth Amendment

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has declared that the privilege against self-incrimination is "an important advance in the development of our liberty – 'one of the great landmarks in man's struggle to make himself civilized.'" *Ullman v. United States*, 350 U.S. 422, 426 (1956). The Fifth Amendment "reflects many of our fundamental values and most noble aspirations." *Murphy v. Waterfront Comm. of N.Y. Harbor*, 378 U.S. 52, 55 (1964). Thus, the rights inherent in the Fifth Amendment "must be accorded liberal construction in favor of the right [the Fifth Amendment] was intended to secure." *Hoffman v. United States*, 341 U.S. 479, 486 (1951).

The right against self-incrimination extends to witnesses as well as defendants. A witness may exercise his or her Fifth Amendment right when an answer given under oath would support the conviction of that witness, or would "furnish a link in the chain of evidence needed to prosecute" that witness. *Hoffman*, 341 U.S. at 486. A witness who has opened the door to incriminating testimony by testifying to certain facts has waived the Fifth Amendment privilege, unless the witness invokes the privilege in response to a question about an unrelated crime.

*Johnson v. United States*, 318 U.S. 189, 195 (1943).

Duran, Castro, and Ramos testified as to facts on the night of the shooting, including Castro's testimony that he had been smoking marijuana. These three witnesses did not waive their right against self-incrimination in unrelated criminal matters by testifying. Under these circumstances, the Court must examine whether the Fifth Amendment rights of Duran, Castro, and Ramos infringed upon petitioner's Confrontation Clause right and his right to a fair trial.

## D. Discussion

While the Sixth Amendment provides "an *opportunity* for effective cross-examination," it does not guarantee "cross examination that is effective in whatever way, and to whatever extent, the defense might wish. *Fensterer*, 474 U.S. at 20 (emphasis in original). However, the Second Circuit "has recognized that in some instances a defendant's [S]ixth [A]mendment right to confrontation will be denied as a result of a witness' invocation of his or her [F]ifth [A]mendment privilege against self-incrimination." *Bagby v. Kuhlman*, 932 F.2d 131, 135 (2d Cir. 1991); *accord Klein v. Harris*, 667 F.2d 274, 289 (2d Cir. 1981); *Dunbar*, 612 F.2d at 692; *Cardillo*, 316 F.2d at 611. This is not such an instance.

The right of a defendant to cross-examine the prosecution's key witnesses are violated only if the witness invokes the Fifth Amendment on a non-collateral issue and when such an invocation "precludes inquiry into the details of his direct testimony" so that "the defense is deprived of the right to test the truth of direct testimony," in which case the testimony should be stricken in whole or in part. *Dunbar*, 612 F.2d 690, 692 (citing

*Cardillo*, 316 F.2d at 611).

Thus, the rights of the witness do not interfere with the rights of the defendant when the witness invokes the Fifth Amendment during questioning on "collateral" matters. *U.S. v. Brooks*, 82 F.3d 50, 54 (2d Cir. 1996) ("If a witness asserts the privilege on cross-examination regarding 'collateral' matters, the witness's direct testimony need not be stricken."). A matter is collateral when the invocation of the privilege does not preclude the defendant from inquiring into the details of the witness's direct testimony. *Dunbar*, 612 F.2d at 692.

"Collateral matters are those that bear solely on the witness' credibility." *Avincola v. Stinson*, 60 F. Supp.2d 133, 156 (S.D.N.Y. July 9, 1999) (collecting cases); *see also Dunbar*, 612 F.2d at 693 ("If the purpose of cross-examination is to explore more than general credibility, the subject of the inquiry is not collateral.") (citing *United States v. Garrett*, 542 F.2d 23, 26 (6th Cir. 1976)). More specifically, the Second Circuit has held that "a witness's testimony about other unrelated crimes may be collateral." *Brooks*, 82 F.3d at 54 (affirming refusal to strike witness's direct testimony after witness asserted Fifth Amendment on questions regarding uncharged drug purchases); *see also Dunbar*, 612 F.2d at 694 (affirming a refusal to strike testimony by a witness who invoked his Fifth Amendment on questions about unrelated crimes); *United States v. Curry*, 993 F.2d 43, 45 (4th Cir. 1993) (holding that striking witness's testimony not warranted "because he only invoked his Fifth Amendment rights with respect to his recent drug activities, which is a collateral matter"); *United States v. Berrio-Londono*, 946 F. 2d 158 (1st Cir. 1991) (affirming a refusal to strike testimony about a witness's drug deals with persons other than the defendant).

Petitioner was not precluded from inquiring into the truthfulness of the witnesses' testimony. Ramos's attempt to invoke the Fifth Amendment right was unsuccessful, as he already had pled guilty to the crime about which petitioner's counsel was asking. Thus, petitioner was able to cross-examine Ramos to the full extent of the Sixth Amendment. Castro and Duran were successful in asserting their Fifth Amendment rights when asked about prior criminal conduct unrelated to the charges against petitioner. Both testified about the night of the shooting and their identification of petitioner. The inquiry into their criminal background was solely aimed at disproving their credibility, and had no bearing on their direct testimony regarding the shooting. As these inquiries were about unrelated criminal conduct, however, they were collateral, and invocation of the witnesses' Fifth Amendment rights did not deny petitioner his Sixth Amendment right to cross-examination.

In sum, the witnesses' assertion of their Fifth Amendment right pertained to collateral matters about other unrelated crimes and did not prohibit petitioner from inquiring into their direct testimony identifying him as the shooter. Therefore, petitioner's third ground for habeas relief is denied.

VI. SANDOVAL CLAIM

Petitioner argues that the trial court improperly allowed inquiry into his prior criminal record, relating to an attempted criminal contempt, when he took the stand on his own behalf. Prior to trial, the trial judge held a proceeding to determine whether the probative value as to credibility of the prior criminal conduct was outweighed by the risk of prejudice, pursuant to *Sandoval*. As set forth

below, the Court finds this claim to be without merit.

Petitioner's prior criminal conduct included two youthful offender adjudications, a violation, and a conviction for attempted criminal contempt for violating an order of protection in a domestic dispute. The prosecution sought to impeach petitioner regarding two of these crimes. At the *Sandoval* hearing, petitioner's counsel argued that it was necessary to call petitioner to the stand in his own defense, and that there was no probative value in admitting the prior criminal conduct. The trial judge (1) denied the prosecution's request to cross-examine petitioner regarding the underlying facts, but not the disposition, of one of the juvenile convictions for attempted grand larceny (which involved an attempt to steal a car),[11] and (2) granted the prosecution's request to cross-examine petitioner about the conviction for attempted criminal contempt (arising from his violation of an order of protection), without going into the facts of the case. At trial, the prosecution inquired into petitioner's conviction for attempted criminal contempt, and asked whether the conviction was the result of petitioner's violation of a court order.

---

[11] Respondent's brief suggests that the trial court allowed questioning regarding this youthful offender crime, but the transcript indicates that the court did not permit it (Tr. 11) and there was no questioning about it during petitioner's cross-examination. In any event, if the trial court had permitted such questioning, it would have been permissible under state law and certainly would not have been a constitutional error warranting habeas relief. *See, e.g., Walker v. Speckard,* 806 F. Supp. 420, 424 (W.D.N.Y. 1992) ("Under *Sandoval* and other state court rulings, acts of individual dishonesty, such as offenses involving theft, have a material relevance to a defendant's credibility on the witness stand.").

(Tr. 563-64.)

The *Sandoval* ruling is a matter of state law as to the admissibility of evidence, the purpose of which is to provide the defendant with a prospective ruling on the possible use of defendant's prior bad acts by the prosecution for the purpose of impeachment. *Miller*, 151 F. Supp. 2d at 247 (citing *Sandoval*, 34 N.Y.2d at 372). Federal habeas courts are limited to the review of state court convictions where there has been a constitutional error so great that the criminal defendant was denied a fair trial. *Cupp v. Naughten*, 414 U.S. 141, 146 (1973); *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (stating that "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States); *Mapp v. Warden N.Y. State Corr. Inst.*, 531 F.2d 1167, 1173 (2d Cir. 1976). Thus, "'[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue *only* where [the] petitioner can show that the error deprived [him] of a *fundamentally fair* trial.'" *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (*quoting Taylor v. Curry,* 708 F.2d 836, 891 (2d Cir. 1983) (emphasis in original; citations omitted)). Many district courts in this circuit have chosen not to review a trial court's *Sandoval* ruling as "the admission of prior convictions for the purpose of impeaching the defendant has been characterized as evidentiary in nature and is therefore not redressable in a federal habeas corpus proceeding absent a showing that the particular errors were of constitutional magnitude." *Jenkins v. Bara*, 663 F. Supp. 891, 899 (E.D.N.Y. 1987) (citing *Gilmore v. Curry*, 523 F.Supp. 1205, 1208 (S.D.N.Y. 1981)); *see Warren v. Miller*, 78 F. Supp. 2d 120 (E.D.N.Y. 2000)*; Sam v. Warden, New York City House of Detention,*

507 F. Supp. 141, 143 (S.D.N.Y. 1981); *United States ex rel. Reid v. Dunham*, 481 F. Supp. 366, 369 (E.D.N.Y. 1979).

In the instant case, there was neither an abuse of discretion under state law in allowing this impeachment, nor sufficient prejudice, even if it was erroneously admitted, to interfere with the petitioner's constitutional right to a fair trial. In *Sandoval*, the New York Court of Appeals explained that:

> [t]o the extent . . . that the prior commission of a particular crime of calculated violence or of specified vicious or immoral acts significantly revealed a willingness or disposition on the part of the particular defendant voluntarily to place the advancement of his individual self-interest ahead of principle or of the interests of society, proof thereof may be relevant to suggest his readiness to do so again on the witness stand. A demonstrated determination deliberately to further self-interest at the expense of society or in derogation of the interests of others goes to the heart of honesty and integrity.

314 N.E.2d at 417-18.

Here, the trial judge allowed petitioner to be cross-examined on the prior conviction for attempted criminal contempt. As petitioner's conviction of attempted criminal contempt resulted from his failure to follow a court order and the rules of the judicial system, the state court did not abuse its discretion in determining that this conviction spoke to petitioner's honesty and credibility in testifying at trial. *See People v. Tirado*, 796 N.Y.S.2d 424, 425 (N.Y. App. Div. 2005) (holding that prior convictions for contempt

related to the defendant's honesty and credibility, and were properly admitted under *Sandoval*). Moreover, where the petitioner was accused of an execution-style murder in connection with gang activity, this Court concludes that, even if this questioning had been erroneously admitted, it did not rise to the level of undue prejudice of a constitutional magnitude so as to deprive petitioner of a fair trial.

In short, the trial court's *Sandoval* ruling was an evidentiary determination under New York law, and the trial judge did not abuse his discretion. Moreover, even assuming *arguendo* that the prior conviction should not have been admitted under New York law, the admission of that evidence was not of such a constitutional magnitude to violate petitioner's constitutional right to a fair trial. Accordingly, petitioner's third ground for habeas relief is meritless.

VII. PROSECUTORIAL MISCONDUCT CLAIM

Petitioner asserts that comments made by the prosecutor during the course of the trial and summation were so improper as to deny petitioner his right to a fair trial. Petitioner cites several instances of alleged prosecutorial misconduct. First, the prosecutor asked petitioner on cross-examination whether he had made a gesture on his cheek while Castaneda was testifying in an effort to threaten reprisals for Castaneda's identification of petitioner as the shooter.[12] (Tr. 564-65.) Petitioner argues

---

[12]The transcript of the questioning reads as follows:

> Q: Mr. Ayala, if you take your finger and run it like this along where your teardrop is [tattooed], what would that mean? (Indicating.) If you took your finger and ran it down your cheek like that, what

17

that the line of questioning constituted "unsworn testimony" of a violent act. (Appellant's Brief at 53.) Petitioner also challenges the prosecution's inquiry as to whether petitioner was at a party in February 1998, where a fight broke out, (Tr. 572), and the prosecutor's remarks to that effect during summation.[13] (Tr. 636.) Petitioner contends that these comments, as a whole, painted an impermissible picture that he is prone to violence.[14]

Further, petitioner argues that the prosecutor shifted the burden to him by emphasizing the dangers of gang violence. The prosecution asked the jury to consider a hypothetical where a gang member misses his target and strikes an innocent bystander.[15] (Tr. 621.) Additionally, the prosecutor remarked that statements that would be "ridiculous" in the real world were no less so merely because the statement was made by defense counsel.[16] (Tr. 622.) Finally, petitioner argues that the prosecutor improperly commented on the strength of the evidence and the credibility of the eyewitnesses, and pointed out that the defense did not provide any evidence that petitioner had been framed. (Tr. 623, 626, 638-40.) Respondent argues that, as petitioner did not raise this claim when he appealed to the Court of Appeals, petitioner is procedurally barred from seeking habeas review on such grounds. Irrespective of a procedural bar, discussed *infra*, petitioner's claim is without merit.

---

would that mean?
A: I don't know.
Q: Do you remember doing this a few days ago in this courtroom when Emerson Castaneda was up on the witness stand?
A: No.
Q: You didn't look at Emerson Castaneda, take your finger and run it along your face where the teardrop is a number of times, like that? (Indicating.)
A: I don't remember that, really.
Q: You don't remember? That wasn't a threat to Emerson Castaneda?
A: No.

(Tr. 564-65.)

[13]The prosecutor stated:

[Petitioner] has been involved and been a member of MS during this bloody gang war that's been going on where these guys have been shooting each other for years. He was even there at that party.

(Tr. 636).

[14] Petitioner's counsel raised no objection to these remarks at trial.

---

[15]Specifically, the prosecutor stated:

What happens when one of these guys shoots and misses and hits an innocent person? Does it become important then? This can't go on. This has to be taken seriously and it has to be taken seriously by you.

(Tr. 621.)

[16]The prosecutor stated:

Things that would seem ridiculous or absurd or unreasonable to you, if you were sitting in your living room and a friend was talking to you, if you are sitting at your dining room table and you heard something you thought was ridiculous, don't become anymore reasonable or logical just because you are sitting in a jury room or you have a lawyer standing up in front of you making suggestions.

(Tr. 622).

As a threshold matter, although petitioner argues that all of these comments were improper, a review of the entire record reveals that many of these questions or comments have been taken out of context and, when examined carefully, are within the acceptable bounds of conduct. It is not improper for a prosecutor to ask questions concerning a defendant's threatening conduct towards witnesses, and the prosecutor did not convert himself into an unsworn witness by asking such question of the petitioner. *See, e.g., United States v. Alberti*, 470 F.2d 878, 882 (2d Cir. 1973) (holding that cross-examination of defendant regarding alleged threats to a witness was proper); *United States v. Hinojosa Gonzalez*, 68 Fed. Appx. 918, 924-25, 2003 WL 21465496 (10th Cir. June 25, 2003) (allowing questioning of a witness as to whether defendant made threatening gesture to witness at court hearing was not an abuse of discretion).

In addition, where, as here, the defendant put on a defense case, including taking the stand himself and claiming he had an alibi, a prosecutor can comment on defendant's failure to support his factual theory without improperly shifting the burden. *See, e.g., United States v. Yuzary*, 55 F.3d 47, 53 (2d Cir. 1995) ("As to the government's summation, the prosecutor was entitled to comment on [defendant's] failure . . . to support his own factual theories with witnesses.") (citations and quotations omitted); *see also United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992) ("The government is entitled to comment on a defendant's failure to call witnesses to support his arguments."). Moreover, although petitioner objects to the prosecutor's of the term "ridiculous," the Second Circuit has reiterated that "[a] prosecutor is not precluded from vigorous advocacy, or the use of colorful

adjectives, in summation." *Id.*, (finding no impropriety where prosecutors stated their personal opinions that defense arguments were "ridiculous"); *see also United States v. Jaswal,* 47 F.3d 539, 544 (2d Cir. 1995) (proper for prosecutor to characterize defendant's case as a "fairy tale").

Similarly, a prosecutor is permitted to respond in an appropriate manner to attacks on the government's case by defense counsel during his summation, including attacks on the credibility of government witnesses. *See, e.g., Rivera*, 971 F.2d at 883 (holding that the prosecution is entitled to respond to defense counsel's claim that the defendant was being framed by the government); *see also Simms v. Moscicki,* 06-CV-2056 (AJP), 2006 WL 2466811, at *19 (Aug. 25, 2006) ("Under New York law, where defense counsel attacks the credibility of one of the prosecution's witnesses, a prosecutor's comments on summation that the witness *was* credible constitute a fair response to remarks made by the defense counsel during summation and generally are not considered improper vouching.") (collecting cases) (report and recommendation adopted by 2007 WL 162295 (S.D.N.Y. Jan. 19, 2007)); *Everett v. Fischer,* 00-CV-6300 (NG), 2002 WL 1447487, at *3 (E.D.N.Y. July 3, 2002) ("[T]he prosecutor's statements that the People's witnesses could have invented a more convincing story if they had wanted to lie and that the witnesses had to face cross-examination by defense counsel were legitimate comments on the crediblity of the People's witnesses, and a fair response to defense counsel's attack on the credibility of the People's witnesses in his summation."); *Zhang v. Bennett,* 99-CV-12007, 2000 WL 869499, at *3 (S.D.N.Y. June 29, 2000) ("[T]he alleged misconduct was not inappropriate as the prosecutor's comments about the gang association and the credibility

of the witnesses were in direct response to the repeated arguments raised during the defense's summation.").

In any event, even assuming *arguendo* that the prosecutor's comments could be construed as straying improperly into witness vouching and appealing to community safety issues, the Court finds that the comments were not sufficiently egregious to warrant habeas relief.

"A criminal conviction 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone' in an otherwise fair proceeding." *Gonzales v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)). "Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute 'egregious misconduct.'" *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (quoting *Donnelly v DeChristoforo*, 416 U.S. 637, 647 (1974)). For such comments to suffice to establish a claim of constitutional error, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). As "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice,'" (*Donnelly,* 416 U.S. at 642 (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)), the Court must review such comments by a prosecutor narrowly to determine whether they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643).

To overcome this burden, petitioner must show that he "suffered actual prejudice because the prosecutor's comments during [testimony and/or] summation had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley*, 41 F.3d at 824 (quoting *Darden*, 477 U.S. at 181). Such prejudice must be shown by "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct." *Id.*

As in the present instance, the prosecutor in *Donnelly* remarked on the strength of his own case.[17] *Donnelly*, 416 U.S. at 639. In that case, the remark was unambiguous, yet the Supreme Court found that the statement was merely trial error, and that the "distinction between ordinary trial error of the prosecutor and that sort of egregious misconduct [that] amount to a denial of constitutional due process" must be maintained. *Id.*, at 647-48. In contrast, the language used by the prosecutor in petitioner's trial, at worst, was merely suggestive of the credibility of the prosecutor's case. A prosecutor's direct remarks on the credibility of witnesses may be inappropriate, but they are "unlikely to have affected the jury's ability to judge the evidence fairly." *Gonzales*, 934 F.2d at 424 (citing *Young*, 470 U.S. at 12-13). In short, to the extent that there were improper comments or questions by the prosecutor, the Court does not find them to fall into the category of severe or egregious misconduct.

As to the second point of the prejudice analysis, the trial judge was able to take steps to remedy any prejudice petitioner may have been subject to as a result of the prosecutor's remarks through jury instructions, whereby the Court reminded jurors that the arguments and

---

[17] The challenged remark was "'I honestly and sincerely believe that there is no doubt in this case, none, whatsoever.'" *Donnelly*, 416 U.S. at 640 n.6.

remarks of counsel are not evidence.[18] Similarly, the trial court repeatedly admonished the jurors that the burden of proof never shifts from the prosecution. (Tr. 653, 660, 663-64). Where there is trial error, the use of a jury instruction to remedy it serves to balance any potential prejudice. *Gonzales,* 934 F.2d at 424. In *Gonzales*, the prosecutor remarked on community safety. *Gonzales* at 424. The Second Circuit held that the remark was inappropriate, but held that the error had been remedied by the court's instruction. *Id.* Thus, in this case, any potential threat to petitioner's constitutional rights was effectively neutralized by the trial judge's instruction.

Finally, the Court finds that the evidence presented of petitioner's guilt was so overwhelming that conviction was certain absent the prejudicial conduct. In *Michaels v. Portuando*, 2002 WL 1732813 at *7-*8, the court found that multiple eyewitness testimony provided sufficient evidence such that remarks by the prosecutors did not alter the probability of conviction. Similarly, in this case, the identification of petitioner as the shooter by five eyewitnesses who knew him personally is so overwhelming as to eclipse any possible prejudice he may have suffered due to the prosecutor's remarks at trial.

_____

[18]The trial judge instructed the jury:

> The arguments, remarks, summations of counsel are not evidence in this case. The evidence you must take from the mouths of the witnesses as you have heard then and from any and all exhibits that I allowed into evidence. You are likewise not to draw an inference from any rulings or instructions of mine as to any of the testimony.

(Tr. 647.)

In short, any prejudice petitioner may have suffered due to the prosecutor's conduct was remedied by the jury instructions and it cannot be said that the prosecutor's remarks "infected the trial" sufficiently to deny petitioner's constitutional right to due process and cause the resulting conviction in light of the overwhelming evidence. Accordingly, petitioner's request for habeas relief based upon alleged prosecutorial misconduct is denied.

VIII. CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 17, 2007
Central Islip, New York

* * *

Petitioner appeared *pro se*. The attorney for the respondent is Kathleen M. Rice, Esq., Nassau County District Attorney's Office, 262 Old Country Road, Mineola, New York 11501.